UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

IZZO GOLF INC.,
f/k/a DANCORP INVESTORS, INC.,

                              Plaintiff

-vs-

KING PAR CORPORATION, B&P BAIRD HOLDINGS,
INC., KP ACQUISITION COMPANY, KING PAR LLC,
WILLIAM J. BAIRD, PAMELA BAIRD, "JOHN DOE"
1-10, "MARY ROE" 1-10 and XYZ CORPORATION
1-10,
                              Defendants

_____

                                        DECISION AND ORDER

                                        10-CV-6507  CJS

## INTRODUCTION

This action was previously stayed after defendant Old King Par Corporation filed for bankruptcy.  The bankruptcy stay is lifted.[1]  Now before the Court are two applications: A motion for a preliminary injunction (Docket No. [#22]) filed by Izzo Golf, Inc. ("Izzo" or "Plaintiff"); and a motion (Docket No. [#24]) to dismiss for lack of personal jurisdiction (Docket No. [#24] filed by defendant William J. Baird ("Mr. Baird").  Both applications are denied.

## BACKGROUND

Izzo and King Par were competing manufacturers of golf equipment.  This action is very closely related to another action pending before the Court involving the same parties, *Izzo Golf, Inc. v. King Par Golf, Inc.*, 6:02-CV-6012., in which Izzo sued King Par for

_____

[1] The bankruptcy stay is also lifted as to the companion case, *Izzo Golf, Inc. v. King Par Corp., et. al.*, 02-CV-6012 CJS MWP.

infringement of a patent for a golf-bag strap system.   On January 8, 2002, Izzo commenced the patent infringement action.   King Par subsequently filed a summary judgment motion, seeking a determination that its golf bags did not infringe Izzo's patent. On July 5, 2007, the Honorable Michael A. Telesca, Senior District Court Judge, issued a Decision and Order granting in part, and denying in part, a summary judgment motion filed by King Par.  In particular, Judge Telesca found that one style of King Par's golf bags (the new-style bag) did not infringe Izzo's patent, while the other style (the old-style bag) infringed the patent.

As the case proceeded toward a trial on damages, Izzo learned of a change in King Par's financial circumstances.  More specifically, by early January, 2009, Izzo learned that Mr. Baird had sold King Par, Inc.'s assets, and had changed the corporation's name to B&P Baird Holdings, Inc.[2]  On January 7, 2010, Izzo's attorneys wrote to King Par's trial counsel about the asset sale, stating, in part, "We are concerned that King Par now has insufficient assets to cover the potential damages caused by the sale of infringing golf bags[.]"  Izzo's attorneys requested supplemental discovery concerning King Par's (B&P Baird's) "current assets," including the details of the asset sale, and indicated that if King Par did not provide such information, Izzo would "move for an order from the Court requiring such disclosure."  King Par's counsel responded that he did not believe that such information was relevant or discoverable as a general matter, and that he was not aware of any particular discovery demand/response on that point that needed to be supplemented.  Nevertheless, on January 27, 2010, King Par's counsel agreed to provide corporate financial information to Izzo, for the years 2004-2008, but indicated that the

---

[2]Kar Aff. [#32-7], Ex. 1.

financial records for 2009 were not finished.

The parties did not bring these matters to the Court's attention.  On January 19, 2010, the Court issued a Pretrial Order [#150], scheduling the trial to begin on June 14, 2010.[3]

Thereafter, the parties had private settlement discussions, of which the Court was also unaware.  On May 6, 2010, King Par offered to settle the case for $425,000.  On June 7, 2010, an Izzo representative had a settlement discussion with Mr. Baird, in which Mr. Baird reportedly said, as an inducement for Izzo to accept his settlement offer, "I only have a $1,000 in the corporate account and who's to say whether the rest of the proceeds[4] went to me or somewhere else."  Izzo's representative understood Mr. Baird to mean that, "even though [King Par] only had $1,000 from which to pay an adverse judgment, he personally was willing to use $425,000 of his own money to settle Izzo's claims."  Izzo rejected the offer, but indicated that it would consider settling for around $1 million.

Between June 14, 2010 and June 18, 2010, the Court conducted a jury trial on the issue of damages.  On June 18, 2010, the jury returned a verdict against King Par in the amount of $3,286,476.65.  It seems clear that King Par was stunned by the size of the verdict, since its trial counsel apparently had estimated that damages would be well below one million dollars.  Immediately following the trial, between June and August of 2010, Izzo filed motions for attorney's fees, pre-judgment interest and post-judgment interest.  King

---

[3]On December 21, 2009, counsel for the parties had appeared before the undersigned for a pretrial conference, "to clarify the issues that remain to be tried, to set a trial date, and to discuss possible settlement."  (The docket sheet incorrectly states that the appearance took place on December 22, 2009.)  At the conference, counsel said nothing to the Court about the asset sale, discovery, or concerns about King Par's ability to pay a judgment.

[4]To the extent that, during oral argument Izzo's counsel suggested that Izzo did not learn until after the trial that Baird had sold King Par's assets, that clearly appears to be incorrect.

Par responded by filing a motion for a new trial.

Shortly thereafter, on September 7, 2010, Izzo commenced the instant action, alleging fraud and other related claims.[5]   The gist of the lawsuit is that King Par, Mr. Baird, and others committed fraud against Izzo in connection with the sale of King Par's assets, leaving only a judgment-proof corporate shell.  More specifically, Izzo alleges that Mr. Baird sold King Par's assets for four million dollars (specifically, $4,010,242.00), which was less than half of their fair-market value, and placed the sale proceeds in his personal account, leaving King Par insolvent, without sufficient corporate assets to fulfill its obligations, including a judgment in the Izzo patent-infringement case.  Izzo's instant lawsuit seeks to have the alleged fraudulent transfer of King Par's assets set aside, and includes an "alter ego" claim against Mr. Baird.

On September 8, 2010, the day after Izzo filed this lawsuit, King Par, now known as B&P Baird Holdings, Inc., filed a Chapter 7 bankruptcy action in U.S. Bankruptcy Court for the Western District of Michigan.   The bankruptcy petition listed the Izzo patent infringement judgment as one of the disputed claims.  On or about September 16, 2010, Izzo informed this Court that King Par had filed for bankruptcy.  Due to the bankruptcy filing, both of Izzo's aforementioned actions before this Court were automatically stayed. Consequently, to date the Court has never addressed the aforementioned post-trial motions in the patent infringement action.

Either through its investigation prior to commencing this action, or during its involvement in the bankruptcy proceedings, Izzo learned the particulars of how Mr. Baird had sold King Par's assets, and how he subsequently handled the "winding-up" of the

---

[5]Subject-matter jurisdiction in this action is based upon diversity, pursuant to 28 U.S.C. § 1332.

corporation.  For example, Izzo learned that Mr. Baird was King Par's sole shareholder, and that he and his wife, Pamela, were the officers and directors of the corporation.  Izzo also discovered that King Par stopped keeping corporate minutes after 2005.  Izzo further learned that, at about the same time that Judge Telesca issued his 2007 summary judgment ruling in the patent infringement action, Mr. Baird began seeking a buyer for King Par, and ultimately entered into an asset purchase agreement with KP Acquisition Company, LLC ("KP Acquisition"), which was formed by a group of individuals including King Par's Chief Financial Officer.

The closing between King Par and KP Acquisition occurred on June 5, 2009.  As part of the sale, King Par transferred all of its operating assets to KP Acquisition.  However, King Par retained operating cash that it had on hand at the time, accounts payable and accounts receivable pre-dating April 2009, and the obligation to pay certain claims, including the Izzo patent infringement claim.   Regarding the infringement claim, Mr. Baird believed at that time, based on his attorney's estimate, that King Par's potential liability at trial was approximately $375,000.00, with a verdict as high as $600,000.00 being an absolute worst-case scenario.

Following the asset sale to KP Acquisition Company, LLC, Mr. Baird changed King Par, Inc.'s name to B&P Baird Holdings, Inc..  Meanwhile, KP Acquisition changed its named to King Par, LLC.  Henceforth in this Decision and Order, the Court will refer to King Par, Inc./B&P Baird Holdings, Inc. as "Old King Par," and will refer to KP Acquisition/King Par, LLC, as "New King Par."

The asset purchase agreement included a general statement that New King Par would "hold back" $420,000.00 at closing, to cover "costs relating to markdowns, charge

backs, warranty claims, and the Izzo Lawsuit."[6]  In fact, though, the $420,000. "holdback" amount was specifically allocated to markdowns ($100k), chargebacks ($20k), warranty claims ($100k) and "China Holdings" ($200k), and did not provide for New King Par to retain any specific sum for the Izzo litigation.[7]

Regarding payment for the asset sale, pursuant to the parties' agreement, New King Par wired the sales proceeds, in the amount of $4,010,242.00, directly into a bank account personally owned by Mr. Baird and his wife, because Old King Par did not have any corporate bank account of its own.  Mr. Baird now contends that such payment was made to him personally for his stock equity, although he previously testified that the payment represented money owed to Old King Par corporation.[8]  After closing, New King Par made additional payments into the Bairds' personal bank account.  Specifically, while as part of the asset sale Old King Par retained the right to certain accounts receivables, it delegated the collection of those accounts to New King Par, in exchange for a collection fee.  New King Par subsequently collected Old King Par's receivables, totaling over $200,000.00, and wired the payments directly into the Baird's personal account since, again, there was no Old King Par corporate bank account.[9]

Following the asset sale, Old King Par effectively ceased doing any business, and all that remained for Mr. Baird to do was to wind up the corporation, pay creditors and await the resolution of the Izzo patent infringement action.  During this period, Mr. Baird paid

---

[6]Asset Purchase Agreement, Art. III, § 3.1.

[7]Asset Purchase Agreement, Art. III, § 3.1.

[8]*See*, Foss Decl. ¶ 26 (citing Baird's deposition testimony).

[9]Foss Decl., Ex. 6 at p. 158.

certain creditors of Old King Par from the personal bank account belonging to himself and Mrs. Baird.  For example, Mr. Baird paid accountants and attorneys, who had provided professional services to Old King Par.  From that same personal account, Mr. Baird also paid the attorneys who were representing Old King Par in the Izzo patent infringement action.  More specifically, between 2009 and 2010, Mr. Baird paid Old King Par's patent litigation attorneys over $20,000.00 from personal bank accounts.  Mr. Baird paid for various other things out of his personal bank account, some of which were purportedly for Old King Par and some of which were purportedly personal, but he did not keep any separate records.

Significantly, Mr. Baird did not set aside any of the sale proceeds, or any other corporate assets, to pay a potential judgment in the Izzo patent infringement action, even though Judge Telesca had already determined that Old King Par's old-style bag infringed Izzo's patent.  Neither did Mr. Baird put aside any money to pay Old King Par's defense counsel for the anticipated trial in the patent infringement action.  Rather, during the period leading up to the trial, Mr. Baird paid defense counsel from the same personal account into which the corporate asset-sale proceeds had been deposited.  According to Mr. Baird, during the post-asset-sale period, he paid both personal and corporate bills from the same personal account that he shared with Mrs. Baird, without differentiating, or considering the difference, between corporate and personal debts.  Izzo's counsel seems to accurately sum up that situation by stating, "Mr. Baird's testimony makes indisputable that he was simply commingling personal and corporate business and funds without regard to source, purpose or application."[10]

---

[10]Foss Decl. at ¶ 45.

As already mentioned, the Izzo patent infringement trial resulted in a $3.2 million judgment against Old King Par, after which Old King Par filed for bankruptcy.  In the course of the bankruptcy proceedings, Bankruptcy Court concluded that the transfers of Old King Par's asset-sale proceeds and accounts receivable, to the Bairds' personal bank account, were constructively fraudulent, insofar as no provision had been made for Old King Par to pay a potential judgment in the Izzo patent litigation.  In that regard, Bankruptcy Court indicated that Old King Par should have reasonably estimated, based on the information that it had at the time, that its potential liability to Izzo was in the neighborhood of $250,000.00.  Although the actual verdict turned out to be much higher, Bankruptcy Court concluded that Mr. Baird had "good reason to believe in 2009 that the Izzo Golf debt would be much less than what it ultimately turned out to be."[11]  Indeed, Bankruptcy Court went so far as to suggest that even Izzo had no idea at the relevant time that the verdict would be so high.[12]  Consequently, Bankruptcy Court indicated that, although Mr. Baird's handling of the winding-down of the Old King Par corporation  was "dubious," it declined to find that he had actual fraudulent intent.  Rather, Bankruptcy Court concluded that Mr. Baird had unreasonably underestimated outstanding liabilities, while simultaneously overestimating the amount of money that Old King Par would receive post-closing from accounts receivable.[13]  At the same time, though,  Bankruptcy Court opined that the placement of the sale proceeds into the Bairds' personal bank account suggested an improper motive.

[11]Foss Decl., Ex. 30 at pp. 39-40.

[12]See, Foss Decl., Ex. 30 at p. 40 (Bankruptcy Court stated: "Indeed, it would appear at that time that Izzo Golf itself was not expecting a $3 million judgment, since subsequent correspondence from Mr. Baird's trial counsel indicates that Izzo Golf had reduced its settlement demand to receive $150,000 only a month before the June 4th, 2009, sale to New King Par closed.").

[13]See, e.g., Foss Decl., Ex. 30 at p. 62 (According to the bankruptcy judge, "Mr. Baird's failure to provide for the Izzo Golf claim was based upon an unreasonable optimism[.]").

Specifically, Bankruptcy Court commented that, "the arrangement certainly suggests that Mr. Baird wanted to gain over Izzo Golf  a negotiating advantage, or, in fraudulent transfer law parlance, Mr. Baird wanted to hinder or delay Izzo Golf by depleting Old King Par of all of its assets and, in particular, its cash."[14]

After Bankruptcy Court's ruling on this point (that the transfer of  Old King Par's sale proceeds to the Bairds' personal bank account was constructively fraudulent), the Bairds settled with the Bankruptcy Trustee, resulting in payments to Izzo in the approximate amount of $3.17 million.[15]

To further complicate matters, as part of the same bankruptcy action, Premier Retail, Inc. ("Premier Retail"), a company sharing common ownership with Izzo, purchased, from the bankruptcy estate,  Old King Par's rights with regard to the defense of the Izzo patent infringement action.  Presumably, therefor, Premier Retail will not oppose Izzo's applications in the patent infringement action for treble damages, attorney's fees and interests, and will withdraw Old King Par's motion for a new trial.

On November 28, 2014, Bankruptcy Court modified the automatic stay, in order to permit Izzo to proceed with the two actions before this Court.  Bankruptcy Court's order remained appealable until December 12, 2014.

On January 14, 2015, Izzo filed the subject motion for a preliminary injunction, requesting an order "preventing [Mr. Baird] from offshoring assets and otherwise acting during the pendency of this action from seeking to frustrate any judgment Plaintiff will likely

---

[14]Foss Decl., Ex. 30 at p. 64.

[15]Foss Decl. at ¶ 53.

obtain[.]"[16]   In that regard, Izzo contends that based upon Mr. Baird's past conduct, as set forth above, it is likely that he will take further actions to frustrate Izzo's ability to collect the outstanding amount of its judgment and any interest and attorney's fees that the Court may award.   As further proof of the need for a preliminary injunction, Izzo alleges, in rather conclusory fashion, that Mr. Baird "has moved assets offshore," to Swiss bank accounts. In support of that assertion, Izzo's attorney avers that he reviewed records in the bankruptcy proceeding which "reflected that Mr. Baird transferred substantial funds to this [sic] Swiss account."   However, the attorney's affirmation does not identify the specific records to which it refers, nor does it indicate when this alleged transfer occurred, or how much money was moved.

On January 23, 2015, Mr. Baird filed an opposition to Izzo's motion, and cross-moved to dismiss the action as against him personally, for lack of subject matter jurisdiction.   With regard to jurisdiction, Baird contends that,

> he is not subject to the Court's jurisdiction, given that he has never lived in New York State, owns no property in this State, transacts no business in New York, and, otherwise, has no contact with the State that could satisfy the minimum contacts required for the Court to exercise personal jurisdiction over him.[17]

Although Izzo's Complaint [#1] asserts that Baird is the alter ego of Old King Par, Baird's motion does not address the issue of whether he might be subject to personal jurisdiction in this action as Old King Par's alter ego.   Rather, his motion is limited to explaining why he believes the Court lacks personal jurisdiction over him personally.

Izzo responds that the Court has personal jurisdiction over Old King Par, and that

---

[16]Foss Decl. at ¶ 1.

[17]Baird Memo of Law [#28] at p. 4.

it therefore also has personal jurisdiction over Baird, who is the corporation's alter ego.  In that regard, Izzo offers several theories under which the Court has jurisdiction over Old King Par, under New York's general jurisdiction statute, New York Civil Practice Law & Rules ("CPLR") 301, and under New York's long-arm statute, CPLR § 302.  First, Izzo contends that Old King Par has waived any objection to personal jurisdiction in this action, since it admitted, *in the underlying patent infringement action*, "that it both does business under CPLR § 301 and transacts business under CPLR § 302(a)(1) in New York."[18] Alternatively, Izzo contends that personal jurisdiction over Old King Par is established in this action under CPLR § 302(a)(1), because Old King Par transacted business in New York by  distributing golf bags that infringed Izzo's patent.  Further, Izzo contends that the Court has jurisdiction under CPLR § 302(a)(2), because Old King Par committed a tortious act in New York, namely, selling the infringing golf bags.  Finally, Izzo contends that because the Court has jurisdiction over Old King Par, it also has jurisdiction over Baird, since he is the alter ego of Old King Par.

In his Reply [#34], Baird disputes that he is Old King Par's alter ego, but does not argue that the exercise of personal jurisdiction over him would be inappropriate if he *was* found to be Old King Par's alter ego, and if Old King Par *was* found to be subject to personal jurisdiction in this action.

With regard to Izzo's application for injunctive relief, Mr. Baird insists that the motion should be denied, because Izzo has not made the necessary showing for such relief, and because "[t]he requested relief equates to a pre-judgment execution on Baird's assets which is grossly inappropriate in this case[.]"  Mr. Baird insists that he did nothing improper

---

[18]Izzo Memo of Law [#32] at p. 3.

in selling Old King Par's assets while the underlying patent infringement case was pending, and maintains, contrary to what Bankruptcy Court found, that the proceeds from the sale should have been enough to cover all of Old King Par's potential liabilities, including a judgment in the patent infringement action.  Rather, he suggests that any such shortfall was caused by New King Par cheating him.  Further, he insists that he is not the alter ego of Old King Par, since "Old King Par consistently followed corporate formalities, remained adequately capitalized, and [had] no intermingling of corporate and personal assets."[19]

On February 6, 2015, counsel for the parties appeared before the undersigned for oral argument on the motions.[20] [21]  Regrettably, following oral argument, the Court failed to issue a ruling in a timely manner, due to a misunderstanding, by the Court's law clerk, as to whether the action was still subject to the bankruptcy stay.  Counsel, who apparently believed that the Court was simply delayed in issuing a decision, waited until August 18, 2016, to inquire about the matter, at which time the Court realized its mistake.  The Court sincerely apologizes to the parties for this delay.

---

[19]Baird Reply Memo [#34] at pp. 14-15.

[20]During oral argument, much of the discussion focused upon whether, and to what extent, Mr. Baird was the alter ego of Old King Par.  For example, Baird argued that even if he was Old King Par's alter ego at the time of the asset transfer, that would not make him personally liable for the infringement of Izzo's patent, since there is no indication that he dominated the corporation at the time of the patent infringement, which was years earlier.  On the other hand, Izzo argued that  if Baird was Old King Par's alter ego following the asset transfer and during the trial, he would be liable for the damages, interest and attorney's fees, resulting from the patent infringement, since he would "stand in the shoes of" Old King Par for all purposes.  The Court does not resolve these issues at this time.

[21]Regarding Izzo's request for injunctive relief, Izzo clarified that it doesn't want to "freeze" Mr. Baird's assets generally, but only wants to prevent him from "making transfers outside of the ordinary course to third parties," and from "transferring offshore what is presently onshore."  On that latter point, with regard to Mr. Baird's alleged transfer of assets to a Swiss bank account, Izzo's counsel asserted that the amount was "over seven figures," but he was unsure of the particulars because it had been "four years" since he had seen documentation about the transfer.

DISCUSSION

There are two applications before the Court: Izzo's motion for a preliminary injunction against Mr.Baird; and Baird's motion to dismiss for lack of personal jurisdiction. The Court will address the jurisdictional argument first.

Rule 12(b)(2) Standards of Law Generally

Baird has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), and the standards for such an application are well-settled and undisputed by the parties:

> In diversity or federal question cases the court must look first to the long-arm statute of the forum state, in this instance, New York. If the exercise of jurisdiction is appropriate under that statute, the court then must decide whether such exercise comports with the requisites of due process.

*Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997) (citations omitted).

In this case, Izzo is relying upon two New York jurisdiction statutes, CPLR § 301 and CPLR § 302(a)(1) & (2).[22] CPLR § 301 applies where a corporation

> is within New York 'not occasionally or casually, but with a fair measure of permanence and continuity so as to show that it is "doing business." While an examination of the various factual permutations which have been held to constitute "doing business" is not necessary to our decision here, what is essential is to note that a fundamental *sine qua non* of all such holdings is the requirement that defendant be shown to have been <u>"doing business" at the time when the action was commenced. This is crucial to the concept of "presence" upon which the jurisdiction is based, since the defendant corporation must be "here" and therefore subject to the State's power, at the very time of the exercise of the jurisdiction itself.</u> Once it is established that the corporation was doing business <u>at such time</u>, personal jurisdiction will be acquired over the corporation for any cause of action asserted against it, no matter where the events occurred which give rise to that cause of action.

---

[22]Pl. Memo of Law [#32] at p. 2 (CM/ECF p. 7).

*Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 156, 581 N.Y.S.2d 283 (1st

Dept. 1992) (emphasis added; citations and internal quotation marks omitted).

Izzo alternatively relies upon CPLR § 302(a)(1) & (2), which state, in pertinent part,

as follows:

> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> > 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> >
> > 2. commits a tortious act within the state[.]

N.Y. C.P.L.R. 302 (McKinney 2016).  "[T]he showing required to establish that a defendant

was 'transact[ing] any business' within the State, pursuant to CPLR 302(a)(1), is

substantially less than that for establishing that a defendant was doing business within the

State [under CPLR § 301]." *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d at

157.  Furthermore,

> while jurisdiction under CPLR 301 requires that defendant's "presence" by virtue of doing business here be demonstrated as of the time of the commencement of the action, which once established would permit defendant to be sued on causes of action wherever they may have arisen, the focus of CPLR 302(a)(1) is quite different. Under the latter, it is not the defendant's activities at the time that the action is commenced that are significant, but, instead, what must be shown is that the defendant had some business contacts within this State and that the cause of action sued upon arose out of those business contacts. What is crucial to the maintenance of a suit against a nondomiciliary under CPLR 302(a)(1) is the establishing of a substantial relationship or nexus between the business transacted by defendant in this State and the plaintiff's cause of action.

*Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d at 157–58 (emphasis added).

The New York Court of Appeals has further explained this nexus requirement, as follows:

> We have interpreted the second prong of the jurisdictional inquiry to require that, in light of all the circumstances, there must be an "articulable nexus" or "substantial relationship" between the business transaction and the claim asserted. We have consistently held that causation is not required, and that the inquiry under the statute is relatively permissive.  But these standards connote, at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.  In effect, the "arise-from" prong limits the broader "transaction-of-business" prong to confer jurisdiction only over those claims in some way arguably connected to the transaction. Where this necessary relatedness is lacking, we have characterized the claim as "too attenuated" from the transaction, or "merely coincidental" with it.

*Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40, 984 N.E.2d 893, 900–01 (2012) (citations omitted).

CPLR § 302(a)(2) requires a similar nexus; that is, the defendant must commit a tortious act "within the state," and the cause of action being sued upon must "arise from" that same tortious conduct.  Significantly, "[p]ersonal jurisdiction arises under [§ 302(a)(2)] only pursuant to actions taken *while physically within New York State*.  New York federal and state courts adhere firmly to this strict, bright-line physical presence requirement." *Hwang v. Grace Rd. Church (in N.Y.)*, No. 14CV7187KAMRML, 2016 WL 1060247, at *5 (E.D.N.Y. Mar. 14, 2016) (emphasis added; citations omitted); *see also, Bensusan Restaurant Corp. v. King*, 126 F.3d at 28-29 ("The acts giving rise to Bensusan's lawsuit . . . were performed by persons physically present in Missouri and not in New York. Even if Bensusan suffered injury in New York, that does not establish a tortious act in the state

of New York within the meaning of § 302(a)(2).") (citation omitted).

Ordinarily, "[i]n order to defeat a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) where, as here, the Court is relying solely upon pleadings and affidavits, a plaintiff need only make a prima facie showing of facts which establish the Court's jurisdiction over the defendant. *Stamper Technology, Inc. v. 3DCD, LLC*, 11-CV-6152-CJS, 2012 WL 12875287 at *2 (W.D.N.Y. Jul. 11, 2012) (citing *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986), other citations omitted). However, "[w]here a challenge to personal jurisdiction is interposed on an application for a preliminary injunction, the district court must determine that the party moving for the injunction has established at least a reasonable probability of ultimate success on the question of the court's *in personam* jurisdiction over the non-moving party." *Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810, 813 (2d Cir. 2012) (citations and internal quotation marks omitted). Importantly, "[a] plaintiff must establish the court's [*in personam*] jurisdiction with respect to each claim asserted." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (citations omitted).

Applying the foregoing principles, the Court finds that Izzo has failed to demonstrate personal jurisdiction over Old King Par or Baird on the basis of "waiver," or under CPLR § 301. However, Izzo has shown, under both the "prima facie" or "reasonable probability of success" standards, that the Court has jurisdiction over Old King Par under CPLR § § 302(a)(1) & (2) with regard to the fraudulent transfer claims alleged in this action, and that Baird should be treated as Old King Par's alter ego for purposes of personal jurisdiction.

<u>Old King Par Has Not Waived Personal Jurisdiction</u>

It is undisputed that the Court has personal jurisdiction over Old King Par in the underlying, separate, patent infringement action, which Izzo commenced in 2002. Old King

Par admitted, in that action, both that it was doing business in New York at the time of service in that action, and that it had sold the allegedly-infringing golf bags in New York.[23] From those facts, Izzo now contends that Old King Par has "waived the defense of lack of personal jurisdiction by admitting that it both does business under CPLR § 301 and transacts business under CPLR § 302(a)(1) in New York."[24]   The Court disagrees.

Most significantly, a party's consent to jurisdiction in one action does not carry over to another action:

> A party's consent to jurisdiction in one case, however, extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available.

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 50 (2d Cir. 1991).  Further, the fact that Old King Par admitted that it was "doing business" in New York in 2002, when the underlying action was commenced, is irrelevant to whether it was doing business in 2010, when the instant action was commenced and service of process was effected.   In fact, it is undisputed that Old King Par ceased doing *any* business in 2009.  On the other hand, Old King Par's admission that it distributed the allegedly-infringing golf bags in New York is relevant to the instant motion, as will be discussed further below; nevertheless, such admission in the related action does not constitute a waiver of personal jurisdiction in this

---

[23]*See*, Foss Reply Decl. [#32-1], Exs. 36 & 37.

[24]Izzo Memo of Law [#32] at p. 3.

action.  For all of these reasons, Izzo's "waiver" argument lacks merit.[25]

Old King Par Is Not Subject to Jurisdiction Under CPLR § 301

To the extent that Izzo is maintaining that Old King Par is subject to jurisdiction under CPLR § 301 in *this action*, such argument also lacks merit.  As already discussed, Old King Par ceased doing any business in 2009.  Consequently, it is clear that Old King Par was not doing business in New York in 2010, when Izzo served the summonses and complaints in this action.  Nor does Old King Par's participation as a defendant in the underlying patent litigation, before this Court, amount to doing business in New York within the meaning of § 301. *See, e.g., Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F. Supp. 669, 675 (S.D.N.Y. 1989) ("The relevant contacts in this case essentially amount to a mere handful of arbitrations and litigations in New York which involve InterPetrol. Clearly, this does not approach "doing business" with the "fair level of permanence and continuity" required under § 301."); *see also, Uzan v. Telsim Mobil Telekomunikasyon Hizmetleri A.S.*, 51 A.D.3d 476, 477, 856 N.Y.S.2d 625, 626 (2008) ("Plaintiff contends that New York has general jurisdiction over Telsim (CPLR 301)[.] . . . [However, s]imply defending an action does not constitute 'doing business.'") (citations and internal quotation marks omitted).

Old King Par Is Subject to Jurisdiction Under CPLR §§ 302(a)(1) & (2)

Izzo alternatively argues that Old King Par is subject to personal jurisdiction in this action, because it "transacted business" in New York, by selling golf bags, and committed

---

[25]Izzo's contention that the Court has jurisdiction over Baird because he is Old King Par's alter ego and the Court has jurisdiction over Old King Par in the patent infringement action likewise fails. *See*, Foss Decl. [#32-1] at ¶ 3.

a tort in the state, by selling golf bags that infringed Izzo's patent.[26]  Of course, the instant

action does not allege patent infringement; rather, it alleges fraudulent transfers that took

place in Michigan.   Nevertheless, Old King Par's sale of the infringing golf bags in New

York amounted to the transaction of business, and the commission of a tort, respectively,

in New York, and there is an "articulable nexus" or "substantial relationship" between those

activities and the claims asserted in this action.[27]  That is, Izzo contends that Old King Par

committed the alleged fraudulent transfers specifically to avoid paying the damages

resulting from the sale of the infringing golf bags.  Accordingly CPLR § § 302(a)(1) & (2)

provides long-arm jurisdiction over Old King Par in this action.

      In addition to meeting the requirements of CPLR § § 302(a)(1) & (2), the Court finds

that exercising jurisdiction over Old King Par in this action comports with Due Process.

*See, e.g., Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)

(Discussing due process requirements for exercising personal jurisdiction).  In that regard,

Izzo has specifically argued that due process is satisfied here as to Old King Par, and Baird

has not argued otherwise, though he contends that the Court's exercise of personal

jurisdiction over him personally would violate due process.  However, since the exercise

of personal jurisdiction over Old King Par does not offend due process, such exercise over

Baird will also not offend due process, provided that he is shown to be Old King Par's alter

ego. *See, Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009)

---

[26] Izzo Memo of Law [#32] at pp. 4-5.

[27] In his reply memo of law, Baird argues that personal jurisdiction in the instant case must
arise, if at all, under CPLR § 301, and that it cannot arise from CPLR § 302, "given that none of the
acts alleged in the Complaint occurred in New York State." Baird Memo of Law [#34] at pp. 10-11.
While the Court agrees that none of the acts alleged in the instant complaint occurred in New York, it
nevertheless finds that there is a sufficient nexus between the claims in this action and the acts that
Old King Par previously committed in New York, to support the exercise of jurisdiction under CPLR §
302(a)(1) & (2).

("[I]n general, alter egos are treated as one entity for jurisdictional purposes.") (citations and internal quotation marks omitted).

<u>Baird is Subject to Personal Jurisdiction As Old King Par's Alter Ego</u>

The next issue is whether Baird is subject to personal jurisdiction as the alter ego of Old King Par.  The applicable legal principles have been stated as follows:

> It is clear that if a court has jurisdiction over a corporation, it may obtain jurisdiction over a corporate officer or shareholder by disregarding the corporate entity.  . . .  In determining whether to disregard the corporate entity, the critical question is whether the corporation is a "shell" being used by the individual shareowners to advance purely personal rather than corporate ends.  The court may consider such factors as the lack of corporate formalities, the inadequate capitalization of the corporation, and the intermingling of corporate and individual finances.  The corporate veil may be pierced either when the defendant has used the corporation to perpetrate fraud, or simply when he has dominated the corporation for his personal business.  One of the factors the courts have considered is whether there has been posttort activity conducted to strip the corporation of its assets in anticipation of impending legal liability.  The existence of this activity, together with substantial ownership of stock of a corporation by one individual will support "piercing the corporate veil" for jurisdictional purposes on grounds of equity and fairness.

*Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 985 (S.D.N.Y. 1992) (citations and internal quotation marks omitted).

Here, Izzo maintains that following the asset sale, Baird acted as Old King Par's alter ego, since he essentially ignored all corporate formalities and commingled the corporation's assets with his own assets.  The Court agrees.  To begin with, Izzo contends, and Baird does not dispute, that Old King Par, which is entirely owned by Mr. Baird, stopped keeping corporate minutes after 2005.  Izzo has further shown that following the closing, Old King Par was undercapitalized, and, in fact, had no distinct assets of its own,

not even a corporate bank account.  And finally, Izzo has made a sufficient showing that during the relevant post-asset sale period, Mr. Baird commingled the corporation's assets (sale proceeds and accounts receivable) with his own money, and utterly failed to recognize any distinction between the corporation's money and debts, and his own money and debts.

Baird denies that he ignored corporate formalities or commingled funds.  In that regard, he insists that all of the money that went into his personal bank account immediately after the asset sale belonged to him, as stockholder equity, and that he expected to pay any outstanding liabilities, including any judgment in the patent litigation trial, from additional funds that he expected to be paid from New King Par for accounts receivable.[28]  However, while the Court need not resolve the issue of Mr. Baird's intent in order to decide this application, it notes that he previously acknowledged that the asset-sale proceeds deposited into his personal account were corporate assets, and that many of the debts that he paid from that personal account were corporate debts. *See, e.g.*, Foss Aff. [#22-3],Ex. 6 at pp. 31, 34, 37-38; Ex. 14 at pp.  54-55, 55-56 ("Q. This deposit of $4,010,242, what is that?  A. What is that?  That was the amount that the new King Par wired me – *new King wired the old corporation*.") (emphasis added), 57, 59-60 ("Q. When the money arrive in the account [belonging to Mr. and Mrs. Baird], who did you think it belonged to?  A. Old King Par and the directors of King Par, I believe.  I'm not exactly sure."), 84.

For all of the foregoing reasons, the Court finds that Izzo has made a sufficient

---

[28] *See, e.g.*, Baird Reply Memo [#34] at p. 13 ("[H]e never had any intention of taking assets belong to Old King Par [and] placing them in his personal account.  He took money the corporation owed him and which it was obligated by the Asset Purchase Agreement to pay him.").

showing of personal jurisdiction over Baird on the alter ego theory.  Consequently, Baird's motion to dismiss under Fed. R. Civ. P. 12(b)(2) is denied.  The Court will now consider Izzo's motion for preliminary injunctive relief.

<u>Preliminary Injunction Standards of Law</u>

Izzo requests a preliminary injunction against Mr. Baird, preventing him from "making transfers outside of the ordinary course to third parties," and from "transferring offshore what is presently onshore."   The standard to be applied when considering an application for preliminary injunctive relief is well settled:

> A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor.

*Doninger v. Niehoff*, 527 F.3d 41,47 (2d Cir.2008) (citations omitted).

> A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.  We have explained that to satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)(citations and internal quotation marks omitted).

Ordinarily, courts will not find irreparable harm where a party is seeking money damages.  *See, Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d at 118 ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.") (citation omitted).  Izzo acknowledges

this general rule, but contends that it will suffer irreparable harm if Baird is allowed to frustrate the collection of the judgment in the underlying patent infringement action:

> The general rule is that injunctive relief is not available to freeze a debtor's assets pending adjudication of an action solely at law.   However, a preliminary injunction is appropriate to prevent a defendant from taking actions to frustrate a judgment.   A party may establish irreparable harm by demonstrating that the defendant has acted to frustrate a judgment.

Izzo Memo of Law [#22-2] at p. 6 (citations and internal quotation marks omitted).   On this point, the Second Circuit has stated that, "a preliminary injunction may issue to preserve assets as security for a . . .  monetary judgment  where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996); *see also, Shamrock Power Sales, LLC v. Scherer*, Case No. 12-CV-8959 (KMK) (JCM), 2016 WL 6102370 at *2 (S.D.N.Y. Oct. 18, 2016) ("[T]he general rule that monetary harm is not irreparable has two exceptions: (1) cases involving obligations owed by insolvents, and (2) where there has been a showing of intent to frustrate any judgment on the merits.") (citations omitted).

<u>The Amount of the Unpaid Judgment</u>

Here, on July 8, 2010, in the underlying patent infringement action, this Court entered judgment against Old King Par, in the amount of $3,286,476.65.[29]  With statutory pre-judgment interest, Izzo estimates that the total amount owed to be $5,037,577.79.  Of that amount, Izzo has already collected $3,171,687.80, leaving a balance owed of $1,865,889.99.  That amount may increase, depending upon the outcome of the post-trial motions.

---

[29] *See*, Case No. 02-CV-6012, Docket No. [#177].

<u>Izzo Has Not Made A Sufficient Showing of Irreparable Harm</u>

In attempting to show irreparable harm, Izzo essentially relies upon two incidents: 1) Baird's sale of Old King Par's assets; and 2) Baird's movement of assets "offshore."[30] Izzo contends that both of those events were intended to frustrate Izzo's ability to collect its judgment in the patent infringement action. *See*, Izzo Memo of Law [#22-2] at p. 13 ("Mr. Baird's actions were designed to remove Old King Par's property from the reach of his creditors.").

Izzo has certainly made a substantial showing that Baird's handling of the winding -up of Old King Par was, as the Bankruptcy Court found, "dubious."   However, on the current record, the Court is not persuaded that Mr. Baird intended to frustrate Izzo's ability to collect a judgment.   To begin with, Izzo's contention regarding Baird's movement of assets "offshore," to a Swiss bank account, is too insubstantial to justify injunctive relief. In that regard, Izzo's moving papers offer almost no details about this alleged event,[31] and during oral argument Izzo's counsel stated only that the amount involved was "over seven figures," though he was unsure of the particulars because it had been "four years" since he had seen documentation about the transfer.   Moreover, Izzo has not shown any temporal nexus between such asset transfer and the patent lawsuit.

Similarly, the present record does not strongly suggest that Baird's sale of Old King Par's assets had anything to do with the Izzo patent litigation.   Indeed, Izzo's own papers seem conflicted as to whether Mr. Baird was simply incompetent in financial matters, or

---

[30]Izzo Memo of Law [#22-2] at p. 13.

[31]See, Foss Aff. [#22-3] at ¶ 68, which merely states as follows: "In addition, Mr. Baird has moved assets offshore.  I reviewed the documents  the Bairds produced in the bankruptcy proceedings revealing that Mr. Baird had moved funds to Swiss bank accounts.  The records reflected that Mr. Baird transferred substantial funds to this Swiss account."

whether he was a cunning schemer.   On this point, Izzo's moving affidavit [#22-2], consisting of 74 paragraphs, seems to paint two different pictures concerning Mr. Baird. Paragraphs 1-55 strongly suggest that Baird neither understood the distinction between the corporation and himself, as the sole owner of the corporation, nor accurately understood the extent of the corporation's post-closing liabilities. *See, e.g.*, Foss Aff. [#22-3] at ¶ 14 ("By August 2009, it became obvious that NKP and OKP differed substantially as to what NKP was likely to remit from the receivables it was collecting . . . which surprised Mr. Baird); ¶ 15 ("The failure of payment after closing alarmed Mr. Baird."); ¶ 26 ("Mr. Baird found it impossible to distinguish between his personal receipt of the funds and corporate receipt of funds."); ¶ 35 ("[T]he Bairds never distinguished between what was personal property and what was business property."); ¶ 36 ("Mr. Baird testified that he was not capable of determining what amounts would be forthcoming from NKP [for post-closing accounts receivable]."); ¶ 36, n. 38 ("Mr. Baird's testimony precludes any claim that he had even a loosely conceived plan and was monitoring performance of it."); ¶ 39 ("Mr. Baird . . . could not have cared less what an expense was for – he simply paid the invoice and forgot about it."); ¶ 41 ("Mr. Baird's testimony . . . demonstrated a subjective conflation of entities."); ¶ 40, n. 42 ("[H]e had no idea which expenses were personal or corporate and could not even be bothered even [sic] to consider separating [them].");  ¶ 42 (referring to Baird's "confusion" as to whether an expense was corporate or personal); ¶ 44 ("Mr. Baird never distinguished between OKP and himself and . . . viewed the obligations he was paying as personal."); ¶ 45 ("Mr. Baird had not the slightest idea how these payments should be characterized."); ¶ 46 ("Testimony concerning payments following the Izzo verdict in June 2010 demonstrates conflation of economic interests in Mr. Baird's mind."); ¶ 47 ("Mr. Baird never distinguished what belonged to him and what belonged to OKP. *He*

and his attorneys in the infringement action put up a $425,000 *Offer of Judgment to end the case.  He testified that he was prepared to write a [personal] check if the offer was accepted*, thereby ending the Izzo dispute.") (emphasis added);  ¶ 49 ("Mr. Baird was unable to formulate a plan to supply the Debtor [corporation, Old King Par,] with capital to make payments for wind up expenses other than to make them from personal accounts with personal funds.").  Thus, Izzo spends the majority of its moving affidavit explaining, in exhaustive detail, that Baird did not appreciate any difference between himself and the corporation.

However, beginning with paragraph 56 of the moving affidavit, Izzo suddenly suggests that Baird wasn't confused at all, and that the transfer of the sale assets into his personal account was part of a carefully-planned scheme to evade paying a potential judgment in the patent litigation. *See, e.g.*, ¶ 56 ("[A]fter Judge Telesca's July 2007 decision awarding Izzo summary judgment as to liability, *Mr. Baird carefully approached resolution of Izzo's claim against King Par in the patent infringement action by intermingling corporate and personal interests to his personal benefit*.") (emphasis added); ¶ 57 (Baird ensured that the "trial was a farce."); ¶ 61 (referring to Baird's "machinations," stating, "There is no question that *Mr. Baird dominated OKP . . . for the express purpose of frustrating any adverse determination*[.]"); ¶ 69 (Referring to Baird's "propensity to act to frustrate enforcement and the demonstrated existing arrangements to accomplish such an end."); ¶ 71 (Alleging that Baird "sought to make" "a mockery" of the patent trial); ¶ 72 ("Mr. Baird typically acts so as not to be accountable.").

The Court finds the former characterization of Mr. Baird to be more likely than the latter.  More specifically, the Court finds, on the present record, that it is more than likely that Mr. Baird's sale of Old King Par was *not* intended to frustrate Izzo's ability to collect

a judgment in the patent action.  Rather, the record suggests that Mr. Baird simply wanted to sell the corporation at that time, and was not particularly concerned whether the sale proceeds went into a personal account or a corporate account, because he was the sole shareholder and intended to pay any judgment, regardless of what type of account the payment came from.  It seems, though, that Baird's plan in that regard was derailed by two events: First, the accounts receivable that he received from New King Par following the closing were drastically smaller than he had anticipated; and second, the verdict in the patent trial was drastically larger than he had anticipated.  This view of the evidence also seems consistent with Bankruptcy Court's decision, discussed earlier.

Izzo's contrary view of the evidence – that Baird orchestrated the sale of Old King Par's assets, and transferred  the proceeds into a personal bank account, in order to avoid paying "a large judgment"[32] in the patent infringement case -- seems implausible for several reasons.  First, it seems undisputed that at the time of the asset sale, Baird had no reason to suspect that Old King Par was facing a $3 million dollar verdict in the patent trial.  Rather, as Bankruptcy Court indicated, Baird seems to have believed that the corporation's potential liability to Izzo was in the neighborhood of $250,000.00.[33]  Izzo doesn't really explain why it would be plausible to think that Baird would sell an $18 million corporation (for $4 million less than what it was worth, according to Izzo),[34] in order to avoid paying a

---

[32]Complaint [#1] at ¶ 50.

[33]Foss Decl., Ex. 30 at pp. 39-40 (Bankruptcy Court concluded that Mr. Baird had "good reason to believe in 2009 that the Izzo Golf debt would be much less than what it ultimately turned out to be.").

[34]The Court is aware that Izzo's complaint in this action alleges that Baird sold Old King Par's assets to New King Par for drastically less than what they were worth, because Old King Par and New King Par were in cahoots.  However, the Court has seen no evidence of such a fraudulent arrangement between Old King Par and New King Par.

$250,000. judgment.  Nor does Izzo provide a convincing explanation for why Baird would go to all the time and expense to create "an empty corporate shell,"[35] and then offer $425,000. of his personal funds to settle the action, particularly when that offer was at the high end of what Baird estimated his exposure to be.  Rather, in the Court's view, such fact is consistent with the idea that Baird intended, at least prior to the unexpectedly-high verdict, not to evade paying Izzo, but to simply pay for a settlement or verdict from his personal account, using the funds that he received from the asset sale.

In sum, the Court finds that Izzo has not made a sufficient showing of irreparable harm, because it has not shown that Baird's sale of Old King Par, and his subsequent handling of the proceeds, were intended to frustrate Izzo's ability to collect a judgment. Accordingly, the Court need not address the other preliminary-injunction factors.

CONCLUSION

The bankruptcy stay in this action and in the companion case, *Izzo Golf, Inc. v. King Par Corp., et. al.*, 02-CV-6012 CJS MWP, is lifted.  Baird's motion to dismiss [#24] is denied.  Izzo's application for a preliminary injunction [#22] is also denied.

SO ORDERED.

Dated:      Rochester, New York
            December 6, 2016

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge

---

[35]Foss Aff. [#22-3] at ¶ 36.