UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

IZZO GOLF INC.,
f/k/a DANCORP INVESTORS, INC.,

                              Plaintiff

                                                    DECISION AND ORDER
-vs-
                                                    10-CV-6507  CJS
KING PAR CORPORATION, B&P BAIRD HOLDINGS,
INC., KP ACQUISITION COMPANY, KING PAR LLC,
WILLIAM J. BAIRD, PAMELA BAIRD, "JOHN DOE"
1-10, "MARY ROE" 1-10 and XYZ CORPORATION
1-10,
                              Defendants
_____

## INTRODUCTION

Now before the Court is Plaintiff's motion for partial summary judgment (Docket No.
[#53]), "determining that Defendant William J. Baird [is] liable[, as alter ego,] for the full
amount of damages for Defendant B & P Baird Holding's Inc.'s (f/k/a King Par Golf, Inc.,
a/k/a "Old King Par") infringement of U.S. Patent No. 5,042,704 belonging to Plaintiff Izzo
Golf Inc., as adjudged in the action styled *Izzo Golf v. King Par Golf Inc.*, No. 6:02-CV-6012
(W.D.N.Y.)."  The application is granted.

## BACKGROUND

The general underlying facts of this case were set forth in the Court's prior Decision
and Order [#38] in this action (denying Plaintiff's motion for preliminary injunctive relief and
Defendant's cross-motion to dismiss), and will only be repeated here as necessary, and
as viewed in the light most-favorable to non-moving defendant William J. Baird ("Baird").

This action is related to *Izzo Golf Inc. v. King Par Golf, Inc.*, 6:02-CV-6012 ("the
patent infringement action"), in which Izzo sued King Par for infringement of a patent for

1

a golf-bag strap system. Izzo and King Par were competing manufacturers of golf equipment. On January 8, 2002, Izzo commenced the patent infringement action. King Par subsequently filed a summary judgment motion, seeking a determination that its golf bags did not infringe Izzo's patent. On July 5, 2007, the Honorable Michael A. Telesca, Senior District Court Judge, issued a Decision and Order granting in part, and denying in part, King Par's summary judgment motion. In particular, Judge Telesca found that one style of King Par's golf bags (the new-style bag) did not infringe Izzo's patent, while the other style (the old-style bag) infringed the patent.

As the patent infringement action proceeded toward a trial on damages, Izzo learned of a change in King Par's corporate circumstances. More specifically, by early January, 2009, Izzo learned that King Par had sold its assets, and had changed its name to B&P Baird Holdings, Inc.[1] On January 7, 2010, Izzo's attorneys wrote to King Par's trial counsel about the asset sale, stating, in part, "We are concerned that King Par now has insufficient assets to cover the potential damages caused by the sale of infringing golf bags[.]" Izzo's attorneys requested supplemental discovery concerning King Par's (B&P Baird's) "current assets," including the details of the asset sale, and indicated that if King Par did not provide such information, Izzo would "move for an order from the Court requiring such disclosure." King Par's trial counsel responded that he did not believe that such information was relevant or discoverable as a general matter, and that he was not aware of any particular discovery demand/response on that point that needed to be supplemented. Nevertheless, on January 27, 2010, King Par's counsel agreed to provide corporate financial information to Izzo, for the years 2004-2008, but indicated that the

---

[1] Kar Aff. [#32-7], Ex. 1.

financial records for 2009 were not finished. The parties did not bring these matters to the Court's attention.

On January 19, 2010, the Court issued a Pretrial Order [#150], scheduling the trial to begin on June 14, 2010.[2] Thereafter, the parties had private settlement discussions, of which the Court was also unaware. On May 6, 2010, King Par's owner, Mr. Baird, offered a settlement in the amount of $425,000. On June 7, 2010, an Izzo representative had a settlement discussion with Baird, in which Baird implied, as an inducement for Izzo to accept his settlement offer, that Old King Par might have been stripped of its assets, stating, "I only have a $1,000 in the corporate account and who's to say whether the rest of the proceeds went to me or somewhere else." Izzo's representative understood Baird to mean that, "even though [King Par] only had $1,000 from which to pay an adverse judgment, he personally was willing to use $425,000 of his own money to settle Izzo's claims."[3] Izzo rejected the offer, but indicated that it would consider settling for around $1 million.

Between June 14, 2010 and June 18, 2010, the Court (which still had not been told about the asset sale and settlement discussions) presided over a jury trial on the issue of damages. On June 18, 2010, the jury returned a verdict against King Par in the amount

---

[2]On December 21, 2009, counsel for the parties had appeared before the undersigned for a pretrial conference, "to clarify the issues that remain to be tried, to set a trial date, and to discuss possible settlement." (The docket sheet incorrectly states that the appearance took place on December 22, 2009.) At the conference, counsel said nothing to the Court about the asset sale, discovery, or concerns about King Par's ability to pay a judgment.

[3]Affidavit of James Kar [#32-6] at ¶ 10 ("On June 7, 2010, approximately a week before trial, I personally spoke with Mr. Baird for approximately 40 minutes in an effort to settle the case. . . . Mr. Baird stated to me "I only have a $1,000 in the corporate account and who's to say whether the rest of the proceeds went to me or somewhere else.") As will be discussed further below, it turned out that there actually was not even a corporate account or $1,000 remaining in Old King Par's name at that time, but Mr. Baird was keeping that fact from Izzo.

of $3,286,476.65. King Par was stunned by the size of the verdict, since King Par's trial counsel had estimated that damages would be well below one million dollars. Immediately following the trial, between June and August of 2010, Izzo filed motions for attorney's fees, pre-judgment interest and post-judgment interest. King Par responded by filing a motion for a new trial.

On September 7, 2010, Izzo commenced the instant action, alleging fraud and other related claims. Subject-matter jurisdiction was based upon diversity.[4] The gist of the lawsuit was that King Par, Baird, and others committed fraud against Izzo in connection with the sale of King Par's assets, leaving only a judgment-proof corporate shell. More specifically, Izzo alleged that Baird sold King Par's assets for four million dollars (specifically, $4,010,242.00), which was less than half of their fair-market value, and placed the sale proceeds in his personal account, leaving King Par insolvent, without sufficient corporate assets to fulfill its obligations, including a judgment in the Izzo patent-infringement case. Izzo sought to have the alleged fraudulent transfer of King Par's assets set aside, and alleged that Mr. Baird was the "alter ego" of King Par. In particular, the Complaint's "Seventh Claim for Relief," entitled "Alter Ego Liability Claim Against William Baird," demands judgment in the amount of the jury's verdict in the patent infringement action, $3,286,476.65[,] plus interest, cost[s] and disbursements."

On September 8, 2010, the day after Izzo filed this lawsuit, B&P Baird Holdings, Inc., filed a Chapter 7 bankruptcy action in U.S. Bankruptcy Court for the Western District of Michigan. The bankruptcy petition listed the Izzo patent infringement judgment as one of the disputed claims. On or about September 16, 2010, Izzo informed this Court that

---

[4]Complaint [#1] at ¶ 1.

King Par had filed for bankruptcy. Due to the bankruptcy filing, both of Izzo's aforementioned actions before this Court were automatically stayed.

Either through its investigation prior to commencing this action, or during its involvement in the bankruptcy proceedings, Izzo learned the particulars of how Mr. Baird had sold King Par's assets, and how he subsequently handled the "winding-up" of the corporation. For example, Izzo learned that Baird was King Par's sole shareholder, and that he and his wife, Pamela, were the officers and directors of the corporation. Izzo also discovered that King Par had stopped keeping corporate minutes after 2005. Izzo further learned that, at about the same time that Judge Telesca issued his 2007 summary judgment ruling in the patent infringement action, Baird began seeking a buyer for King Par, and ultimately entered into an asset purchase agreement with KP Acquisition Company, LLC ("KP Acquisition"), an entity that was formed by a group of individuals including King Par's Chief Financial Officer.

The closing between King Par and KP Acquisition occurred on June 5, 2009. As part of the sale, King Par transferred all of its operating assets to KP Acquisition. However, King Par retained operating cash that it had on hand at the time, accounts payable and accounts receivable pre-dating April 2009, as well as the obligation to pay certain claims, including the Izzo patent infringement claim. Regarding the infringement claim, Mr. Baird believed at that time, based on his attorney's estimate, that King Par's potential liability at trial was approximately $375,000.00, with a verdict as high as $600,000.00 being an absolute worst-case scenario.

Following the asset sale to KP Acquisition, Baird changed King Par, Inc.'s name to B&P Baird Holdings, Inc. Meanwhile, KP Acquisition changed its named to King Par, LLC. Henceforth in this Decision and Order, the Court will refer to King Par, Inc./B&P Baird

Holdings, Inc. as "Old King Par," and will refer to KP Acquisition/King Par, LLC, as "New King Par."

The asset purchase agreement included a general statement that New King Par would "hold back" $420,000.00 at closing, to cover "costs relating to markdowns, charge backs, warranty claims, and the Izzo Lawsuit."[5] In fact, though, the $420,000. "holdback" amount was specifically allocated to markdowns ($100k), chargebacks ($20k), warranty claims ($100k) and "China Holdings" ($200k), and did not provide for New King Par to retain any specific sum for the Izzo litigation.[6]

Regarding payment for the asset sale, pursuant to the parties' agreement, New King Par wired the sales proceeds, in the amount of $4,010,242.00, directly into a bank account personally owned by Baird and his wife, because Old King Par did not have any corporate bank account of its own. Baird has alternately indicated that such payment was made to him personally for his stock equity, and that such payment represented money owed to Old King Par corporation.[7] After closing, New King Par made additional payments into the Bairds' personal bank account. Specifically, while as part of the asset sale Old King Par retained the right to certain accounts receivables, it delegated the collection of those accounts to New King Par, in exchange for a collection fee. New King Par subsequently collected Old King Par's receivables, totaling over $200,000.00, and wired the payments directly into the Baird's personal account since, again, there was no Old King Par corporate

---

[5]Asset Purchase Agreement, Art. III, § 3.1.

[6]Asset Purchase Agreement, Art. III, § 3.1.

[7]*See*, Foss Decl. ¶ 26 (citing Baird's deposition testimony).

bank account.[8]

Following the asset sale, Old King Par effectively ceased doing any business, and all that remained for Mr. Baird to do was to wind up the corporation, pay creditors and await the resolution of the Izzo patent infringement action. Significantly, though, to anyone not directly involved in the asset sale between Old King Par and New King Par, it would have appeared that Old King Par was continuing to do business as usual. Even persons closely associated with Old King Par, such as the patent attorney who had represented the corporation for decades, were not apprised of the asset sale. For example, even as the damages trial was proceeding before this Court, Mr. Baird did not tell Old King Par's patent-law attorneys, Young & Basile, P.C., ("Young & Basile") that he had sold the corporation's assets. Nor did Baird inform the damages expert, Jeffrey Hauswirth ("Hauswirth"), who had been retained by Old King Par to testify at trial, about the asset transfer.

Mr. Baird did not set aside any of the sale proceeds, or any other corporate assets, to pay a potential judgment in the Izzo patent infringement action, even though Judge Telesca had already determined that Old King Par's old-style bag infringed Izzo's patent. Neither did Baird put aside any money to pay Young & Balile or Hauswirth for their participation at trial in the patent infringement action.

During the period between the asset sale and the trial, Baird paid certain Old King Par creditors from the same personal account into which the corporate asset-sale proceeds had been deposited. According to Baird, during the post-asset-sale period, he paid both personal and corporate bills from the same personal account that he shared with Mrs.

---

[8]Foss Decl., Ex. 6 at p. 158.

Baird, without differentiating, or considering the difference, between corporate and personal debts. Izzo's counsel accurately summed up that situation by stating, "Mr. Baird's testimony makes indisputable that he was simply commingling personal and corporate business and funds without regard to source, purpose or application."[9]

During the course of the bankruptcy proceedings that followed the jury verdict in the patent infringement action, Bankruptcy Court concluded that the transfers, of Old King Par's asset-sale proceeds and accounts receivable into the Bairds' personal bank account, were constructively fraudulent, insofar as no provision had been made for Old King Par to pay a potential judgment in the Izzo patent litigation. In that regard, Bankruptcy Court indicated that Old King Par should have reasonably estimated, based on the information that it had at the time, that its potential liability to Izzo was in the neighborhood of $250,000.00. Although the actual verdict turned out to be much higher, Bankruptcy Court concluded that Mr. Baird had "good reason to believe in 2009 that the Izzo Golf debt would be much less than what it ultimately turned out to be."[10] Consequently, Bankruptcy Court indicated that, although Mr. Baird's handling of the winding-down of the Old King Par corporation was "dubious," it was declining to find that he had actual fraudulent intent. Rather, Bankruptcy Court concluded that Mr. Baird had unreasonably underestimated outstanding liabilities, while simultaneously overestimating the amount of money that Old King Par would receive post-closing from accounts receivable.[11] At the same time, though, Bankruptcy Court opined that the placement of the sale proceeds into the Bairds' personal

---

[9]Foss Decl. at ¶ 45.

[10]Foss Decl., Ex. 30 at pp. 39-40.

[11]*See, e.g.*, Foss Decl., Ex. 30 at p. 62 (According to the bankruptcy judge, "Mr. Baird's failure to provide for the Izzo Golf claim was based upon an unreasonable optimism[.]").

bank account suggested an improper motive. Specifically, Bankruptcy Court commented that, "the arrangement certainly suggests that Mr. Baird wanted to gain over Izzo Golf a negotiating advantage, or, in fraudulent transfer law parlance, Mr. Baird wanted to hinder or delay Izzo Golf by depleting Old King Par of all of its assets and, in particular, its cash."[12]

After Bankruptcy Court's ruling on this point (that the transfer of Old King Par's sale proceeds to the Bairds' personal bank account was constructively fraudulent), the Bairds settled with the Bankruptcy Trustee, resulting in payments to Izzo in the approximate amount of $3.17 million.[13] However, Izzo's post-trial motions seeking, *inter alia*, treble damages and attorney fees, remain pending before this Court. In that regard, as part of the same bankruptcy action, Premier Retail, Inc. ("Premier Retail") purchased, from the bankruptcy estate Old King Par's rights with regard to the defense of the Izzo patent infringement action. Premier Retail and Izzo have common ownership, meaning that Izzo is now essentially both the plaintiff and defendant in the patent infringement action. Presumably, therefor, Premier Retail will not oppose Izzo's applications in the patent infringement action for treble damages, attorney's fees and interests, and will withdraw Old King Par's motion for a new trial.

On November 28, 2014, Bankruptcy Court modified the automatic stay, in order to permit Izzo to proceed with the two actions before this Court. Bankruptcy Court's order remained appealable until December 12, 2014.

On January 14, 2015, Izzo filed a motion for a preliminary injunction, requesting an order "preventing [Mr. Baird] from offshoring assets and otherwise acting during the

---

[12]Foss Decl., Ex. 30 at p. 64.

[13]Foss Decl. at ¶ 53.

pendency of this action from seeking to frustrate any judgment Plaintiff will likely obtain[.]"[14] In that regard, Izzo contended that it was likely that Mr. Baird would take further actions to frustrate Izzo's ability to collect the outstanding amount of its judgment and any interest and attorney's fees that the Court may award. On January 23, 2015, Baird filed an opposition to Izzo's motion, and cross-moved to dismiss the action as against him personally, for lack of subject matter jurisdiction. In connection with those motions, Baird disputed that he was Old King Par's alter ego, but did not argue that the exercise of personal jurisdiction over him would be inappropriate if he *was* found to be Old King Par's alter ego, and if Old King Par *was* found to be subject to personal jurisdiction in this action.

On December 6, 2016, the Court issued a Decision and Order [#38], denying both Izzo's request for preliminary injunctive relief and Baird's cross-motion to dismiss for lack of personal jurisdiction. With regard to personal jurisdiction, the Court found that Old King Par was subject to personal jurisdiction in New York, pursuant to New York CPLR § § 302(a)(1)&(2), due to having sold infringing golf bags in New York, and that Baird was the alter ego of Old King Par, and was therefore also subject to personal jurisdiction. On this point, the Court stated, in pertinent part:

> The next issue is whether Baird is subject to personal jurisdiction as the alter ego of Old King Par. The applicable legal principles have been stated as follows:
>
> > It is clear that if a court has jurisdiction over a corporation, it may obtain jurisdiction over a corporate officer or shareholder by disregarding the corporate entity. . . . In determining whether to disregard the corporate entity, the critical question is whether the corporation is a "shell" being used by the individual shareowners to advance purely personal rather than corporate ends. The court may consider such factors as the

---

[14] Foss Decl. at ¶ 1.

lack of corporate formalities, the inadequate capitalization of the corporation, and the intermingling of corporate and individual finances. The corporate veil may be pierced either when the defendant has used the corporation to perpetrate fraud, or simply when he has dominated the corporation for his personal business. One of the factors the courts have considered is whether there has been post[-]tort activity conducted to strip the corporation of its assets in anticipation of impending legal liability. The existence of this activity, together with substantial ownership of stock of a corporation by one individual will support "piercing the corporate veil" for jurisdictional purposes on grounds of equity and fairness.

*Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 985 (S.D.N.Y. 1992) (citations and internal quotation marks omitted).

Here, Izzo maintains that following the asset sale, Baird acted as Old King Par's alter ego, since he essentially ignored all corporate formalities and commingled the corporation's assets with his own assets. The Court agrees. To begin with, Izzo contends, and Baird does not dispute, that Old King Par, which is entirely owned by Mr. Baird, stopped keeping corporate minutes after 2005. Izzo has further shown that following the closing, Old King Par was undercapitalized, and, in fact, had no distinct assets of its own, not even a corporate bank account. And finally, Izzo has made a sufficient showing that during the relevant post-asset sale period, Mr. Baird commingled the corporation's assets (sale proceeds and accounts receivable) with his own money, and utterly failed to recognize any distinction between the corporation's money and debts, and his own money and debts.

Baird denies that he ignored corporate formalities or commingled funds. In that regard, he insists that all of the money that went into his personal bank account immediately after the asset sale belonged to him, as stockholder equity, and that he expected to pay any outstanding liabilities, including any judgment in the patent litigation trial, from additional funds that he expected

to be paid from New King Par for accounts receivable.[15]  However, while the Court need not resolve the issue of Mr. Baird's intent in order to decide this application, it notes that he previously acknowledged that the asset-sale proceeds deposited into his personal account were corporate assets, and that many of the debts that he paid from that personal account were corporate debts.

Decision and Order [#38] at pp. 20-21.  In sum, applying New York procedural law the Court determined that Baird was Old King Par's alter ego for purposes of personal jurisdiction.

With regard to Izzo's application for preliminary injunctive relief, the Court determined that  Izzo had not made a sufficient showing of irreparable harm.  In particular, the Court found that Izzo had not adequately shown that Baird's sale of King Par's assets was designed to frustrate Izzo's ability to collect a judgment in the patent infringement action.  On this point, the Court stated, in pertinent part:

Izzo has certainly made a substantial showing that Baird's handling of the winding -up of Old King Par was, as the Bankruptcy Court found, "dubious." However, on the current record, the Court is not persuaded that Mr. Baird intended to frustrate Izzo's ability to collect a judgment.
***
[T]he present record does not strongly suggest that Baird's sale of Old King Par's assets had anything to do with the Izzo patent litigation.  Indeed, Izzo's own papers seem conflicted as to whether Mr. Baird was simply incompetent in financial matters, or whether he was a cunning schemer.
***
[T]he Court finds, on the present record, that it is more than likely that Mr. Baird's sale of Old King Par was *not* intended to frustrate Izzo's ability to collect a judgment in the patent action.  Rather, the record suggests that Mr. Baird simply wanted to sell the corporation at that time, and was not

---

[15] *See, e.g.*, Baird Reply Memo [#34] at p. 13 ("[H]e never had any intention of taking assets belong to Old King Par [and] placing them in his personal account.  He took money the corporation owed him and which it was obligated by the Asset Purchase Agreement to pay him.").

particularly concerned whether the sale proceeds went into a personal account or a corporate account, because he was the sole shareholder and intended to pay any judgment, regardless of what type of account the payment came from. It seems, though, that Baird's plan in that regard was derailed by two events: First, the accounts receivable that he received from New King Par following the closing were drastically smaller than he had anticipated; and second, the verdict in the patent trial was drastically larger than he had anticipated. This view of the evidence also seems consistent with Bankruptcy Court's decision, discussed earlier.

Izzo's contrary view of the evidence – that Baird orchestrated the sale of Old King Par's assets, and transferred the proceeds into a personal bank account, in order to avoid paying "a large judgment"[16] in the patent infringement case -- seems implausible for several reasons. First, it seems undisputed that at the time of the asset sale, Baird had no reason to suspect that Old King Par was facing a $3 million dollar verdict in the patent trial. Rather, as Bankruptcy Court indicated, Baird seems to have believed that the corporation's potential liability to Izzo was in the neighborhood of $250,000.00.[17] Izzo doesn't really explain why it would be plausible to think that Baird would sell an $18 million corporation (for $4 million less than what it was worth, according to Izzo),[18] in order to avoid paying a $250,000. judgment. Nor does Izzo provide a convincing explanation for why Baird would go to all the time and expense to create "an empty corporate shell,"[19] and then offer $425,000. of his personal funds to settle the action, particularly when that offer was at the high end of what Baird estimated his exposure to be. Rather, in the Court's view, such fact is consistent with the idea that Baird intended, at least prior to the unexpectedly-high verdict, not

---

[16]Complaint [#1] at ¶ 50.

[17]Foss Decl., Ex. 30 at pp. 39-40 (Bankruptcy Court concluded that Mr. Baird had "good reason to believe in 2009 that the Izzo Golf debt would be much less than what it ultimately turned out to be.").

[18]The Court is aware that Izzo's complaint in this action alleges that Baird sold Old King Par's assets to New King Par for drastically less than what they were worth, because Old King Par and New King Par were in cahoots. However, the Court has seen no evidence of such a fraudulent arrangement between Old King Par and New King Par.

[19]Foss Aff. [#22-3] at ¶ 36.

to evade paying Izzo, but to simply pay for a settlement or verdict from his personal account, using the funds that he received from the asset sale.

In sum, the Court finds that Izzo has not made a sufficient showing of irreparable harm, because it has not shown that Baird's sale of Old King Par, and his subsequent handling of the proceeds, were intended to frustrate Izzo's ability to collect a judgment. Accordingly, the Court need not address the other preliminary-injunction factors.

Decision and Order [#38] at pp. 24-28.

On December 15, 2017, Plaintiff filed the subject motion for partial summary judgment, that Mr. Baird is the alter ego of Old King Par, and therefore personally liable for whatever amount is eventually assessed against Old King Par in the patent infringement action. In particular, Izzo's motion demands judgment "for the full amount of damages for [Old King Par's] infringement of U.S. Patent No. 5,042,704 belonging to Plaintiff Izzo Golf Inc., as adjudged in the [patent infringement action.]" Of course, that "full amount" is unknown at this time, as the post-trial motions are still pending.

Izzo contends that under the substantive law of the State of Michigan, where Old King Par was incorporated, Baird is Old King Par's alter ego. The facts upon which Izzo relies are generally the same that were discussed above, along with the following additional facts: 1) in connection with the asset sale, Baird expressly rejected suggestions that he establish an escrow account to pay Old King Par's creditors, and instead stated that he would "handle it"; and 2) following both the asset sale and trial, Baird selectively paid Old King Par creditors who could benefit him personally, while leaving other creditors (including Old King Par's trial counsel Young & Basile, local counsel Nixon Peabody LLP, and damages expert Hauswirth, none of whom were told of the asset sale until after the trial in which they participated at Old King Par's behest) to seek relief in bankruptcy court.

On January 17, 2018, Baird filed a response [#55, 56] to Izzo's motion. Baird contends first, that the discovery that Izzo obtained since the Court's denial of the preliminary injunction motion is "inconsequential,"[20] suggesting that the facts essentially remain as they were before the Court at the time of that ruling. Such facts, Baird maintains, fail to justify piercing of Old King Par's corporate veil. Baird further maintains that Izzo's present reliance upon Michigan law is contrary to the Complaint in this action, which purports to plead an alter-ego claim under New York law. Alternatively, Baird indicates that if the Court applies Michigan law, he wins nevertheless, since the Court has already found that he did not intend to defraud Izzo when he sold Old King Par's assets.

Baird also disputes Izzo's view of his potential damages, in the event that this Court finds that he is Old King Par's alter ego. On this point, Baird argues that Izzo would be limited to the amount demanded in the Complaint, which, he contends, is less than what Izzo is now demanding in connection with the subject motion. In that regard, Baird maintains that as part of the bankruptcy proceeding, he and Izzo settled all of the claims in the instant complaint, except the Seventh Claim for Relief, and that such claim

> seeks 'the amount of $3,286,476.65 plus interest, cost[s] and disbursements.' Nothing is mentioned regarding the 'Whole Hog' demand made in [Izzo's] motion seeking exposure for Baird in whatever amount Old King Par is found to eventually owe in the Patent Litigation.

Baird Memo of Law [#55-1] at p. 4.

On February 13, 2018, Izzo filed a reply [#57]. Izzo begins by noting that no triable issues of fact have been identified. Izzo further states that the undisputed facts indicate that Baird completely disregarded corporate formalities, and used Old King Par as a mere

---

[20]Pl. Memo of Law [#55-1] at p. 5.

instrumentality to commit a fraud or wrong. Izzo contends that Baird's attempt to rely upon the Court's prior decision in this case, denying preliminary injunctive relief, is misplaced because that decision focused on whether Baird intended to create an empty shell when he sold Old King Par's assets, while the issue now before the Court is whether Baird used that corporate shell to commit a fraud or wrong.[21] On this point, Izzo states:

> At the preliminary injunction stage, the Court found the facts 'consistent with the idea that Baird intended, at least prior to the unexpectedly-high verdict, not to evade paying Izzo, but to simply pay for a settlement or verdict from his personal account, using the funds that he received from the asset sale.' **Izzo's present motion to pierce the corporate veil seeks only to hold Baird to that intention, *i.e.*, that he pay the judgment**.

Pl. Memo of Law [#57] at p. 9 (emphasis added). Izzo further maintains that to prove Baird used Old King Par to commit a fraud or wrong, it need only show that such misuse prejudiced third parties, which it has done. As an example of this Izzo states that Baird "put Izzo and the Court through a week-long trial on damages even though he knew the company had zero assets left to pay a judgment."[22] Izzo further contends that Baird caused it to suffer an unjust loss, by stripping Old King Par of its assets following Judge Telesca's grant of partial summary judgment on liability.[23]

As for Baird's contention that Izzo's present motion is inconsistent with the Complaint insofar as it is based upon Michigan law, Izzo contends that the argument should be rejected for several reasons. For example, Izzo indicates that it is not necessary

---

[21] Pl. Memo of Law [#57] at p. 7 ("Baird's intention when he stripped Old King Par of all its assets is not the basis for Izzo's present motion. Rather, this motion is based on Baird's *use* of the assetless shell of Old King Par.") (emphasis in original).

[22] Pl. Memo of Law [#57] at p. 8.

[23] Pl. Memo of Law [#57] at p. 8 ("Baird withdrew all of the company's money after liability was certain. Izzo's inability to collect constitutes an unjust injury.").

to cite a particular source of substantive law to state an actionable claim, and that the veil-piercing claim in the Complaint does not reference New York law in any event.

Lastly, Izzo disputes Baird's contention that damages should be limited to what was demanded in the Complaint, which amount seems to exclude any treble damages and attorney fees that might be awarded by the Court. Izzo maintains that in the event that Baird is determined to be the alter ego of Old King Par, he will be personally liable for whatever amounts, including enhanced damages and attorney fees, that may be awarded against Old King Par in the patent infringement action, and that Izzo will amend its complaint as necessary to achieve that outcome.

On May 17, 2018, counsel for the parties appeared before the undersigned for oral argument. In pertinent part, Baird's counsel suggested that the only reason Baird did not pay Old King Par's creditors was because he was prevented from doing so by the bankruptcy action.[24] Baird's counsel also asserted that if the Court grant's Izzo's motion for partial summary judgment, Baird would not be liable (as Old King Par's alter ego) for the entire amount that may eventually be imposed against Old King Par in the patent infringement action, including enhanced damages and attorney's fees, if any, but rather, would only be liable to Izzo up to the amount of asset-sale proceeds which he improperly took. Izzo's counsel disagreed with those arguments, and further maintained that the

---

[24]Baird suggests that he only filed the bankruptcy action in response to Izzo filing this action. For example, during oral argument, Baird's counsel stated: "[U]nder the advice of counsel, *once Izzo sued him individually in this Court in this particular case he was advised to put the company into bankruptcy*." (emphasis added). The clear implication of this statement is that Baird was not considering bankruptcy for Old King Par until Izzo commenced this action. However, Izzo did not file this action until September 7, 2010, which was more than two months after the infringement trial ended. Even if Baird was reluctant to pay his patent trial attorney following the jury verdict, due to concerns about possible legal malpractice by such attorney (the same attorney had also provided an opinion letter indicating that King Par's golf bags did not infringe Izzo's patent), there seems to be no good reason why he would have failed to pay his damages expert or local counsel, neither of whom admittedly did anything wrong, or any of the other Old King Par creditors who were left unpaid long before the bankruptcy action was filed.

criteria upon which the Court previously found that Baird was subject to personal jurisdiction in New York as Old King Par's alter ego, also satisfies the requirements for finding alter ego under Michigan law.

ANALYSIS

Plaintiff has moved for partial summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Izzo maintains, and Baird has not really disputed,[25] that this Court must apply Michigan state law to decide whether to pierce Old King Par's corporate veil, since Old King Par is incorporated in Michigan. On this point, another court in this Circuit recently stated:

> To determine which law to apply to [the plaintiff's] alter ego allegations, this Court must employ a choice-of-law analysis. When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules. It is well-settled that New York's choice-of-law rules dictate that the law of the state of incorporation determines when the corporate form will be disregarded. Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.

*Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (citations and internal quotation marks omitted); *accord, Aqua Master Enter., Inc. v. Anderson*, No. 16CIV6776LGSHBP, 2018 WL 1009264, at *3 (S.D.N.Y. Jan. 30, 2018) ("It is well established that when a federal district court sits in diversity, as the Court does here, it must generally apply the law of the state in which its sits—including that state's choice-of-law rules. . . . Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (citations and internal quotation marks omitted), *report and recommendation adopted*, No. 16-CV-6776-LGS, 2018 WL 1010318 (S.D.N.Y. Feb. 20,

---

[25]Baird accuses Izzo of improperly changing its legal theory, but does not argue that Izzo is incorrect when it asserts that Michigan law applies. *See*, Def. Memo of Law [#55-1] at p. 5 ("In an interesting change of legal theory, and contradictory to it's Complaint and prior legal position before this Court, Izzo has brought it's Motion under the law of the State of Michigan."). Rather, Baird argues that if the Court applies Michigan law, it should find that Izzo has not met the standard to pierce the corporate veil. *Id*. at p. 7 ("If the Court considers the analysis given under Michigan law, the Motion should be denied for the same reasons given regarding the Motion for Preliminary Injunction.").

2018).  Since there is no dispute that Old King Par was incorporated in Michigan, the Court will apply Michigan law in deciding whether to pierce the corporation's corporate veil.

Izzo contends that Michigan law is unclear on the issue of alter ego liability, with some courts requiring only a showing of misuse of corporate form, and some courts requiring an additional showing of fraud or wrongdoing. *See, e.g.*, *L & R Homes, Inc. v. Jack Christenson Rochester, Inc.*, 475 Mich. 853, 854, 713 N.W.2d 263, 264 (2006) (Referring to "the confused state of Michigan jurisprudence regarding this problem.") (Opinion dissenting from decision of Michigan Supreme Court denying leave to appeal in case involving misuse of corporate form).

Izzo nevertheless maintains that it is entitled to judgment even under the more rigorous of the two Michigan veil-piercing standards, which has been delineated as follows:

> As a general proposition, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock.  This fiction is a convenience, introduced to serve the ends of justice.  However, when this fiction is invoked to subvert justice, it may be ignored by the courts.  The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations.
>
> There is no single rule delineating when the corporate entity may be disregarded.  The entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused. [Recently, we] upheld the following standard for piercing the corporate veil: *First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.*

*Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 456–57, 559 N.W.2d 379, 380–81

(1996) ("*Foodland*") (emphasis added; citations and internal quotation marks omitted).

As noted earlier, when the corporate veil is pierced, the corporate entity is "disregarded." Stated alternatively, where corporate veil-piercing is appropriate, "the fiction of a distinct corporate entity separate from the stockholders" will be "ignored by the courts." *See, Wells v. Firestone Tire & Rubber Co.*, 421 Mich. 641, 650, 364 N.W.2d 670, 674 (Supreme Court of Michigan 1984) ("[T]he fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts.") (citations omitted). This appears to be an "all or nothing" proposition. That is, where the corporate veil is pierced, the offending "alter-ego" shareholder is liable to the same extent as the corporation. *See, Montgomery v. Cent. Nat. Bank & Tr. Co. of Battle Creek*, 267 Mich. 142, 147–48, 255 N.W. 274, 275–76 (Supreme Court of Michigan 1934) ("Circumstances of a case may sometimes require a court of equity to ignore the separate entity of a corporation, and to look to the sole owner of its capital stock as *the real party in interest*. . . . [I]t has been held that in an appropriate case, and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as *identical*.") (emphasis added).

Applying the foregoing principles, the Court agrees that Izzo is entitled to partial summary judgment as to liability against Baird under the *Foodland* standard. First, there can be no doubt that at all relevant times Old King Par was a mere instrumentality for Mr. Baird. Baird, as the sole shareholder, disregarded corporate formalities and failed to maintain or even appreciate any distinction between the corporation and himself. *See, Green v. Ziegelman*, 310 Mich. App. 436, 461, 873 N.W.2d 794, 808-809 (Mich. Ct. of Appeals 2015) (Finding mere instrumentality where, *inter alia*, sole shareholder failed to

maintain corporate formalities).

Second, Baird used Old King Par's corporate form to commit wrongs against creditors, including Izzo, Young & Basile, Nixon Peabody and Hauswirth. For example, prior to and during the patent infringement trial, Baird led those entities to believe that Old King Par still existed as a corporation, in order to induce them to take part in a week-long federal jury trial. In that regard, Baird hid the fact that Old King Par was a mere asset-less corporate shell. Although Izzo apparently knew prior to the trial that Old King Par had sold its assets, there is no indication Izzo knew that the proceeds had gone directly into Mr. Baird's bank account.

As for Young & Basile, Nixon Peabody and Hauswirth, Baird did not even tell them about the asset sale. It is reasonable to infer that if they had known the true state of affairs, they would not have taken part in the trial, at least not without a personal guarantee from Baird. [26] Baird essentially used Old King Par's corporate shell to obtain expensive professional services from unsuspecting creditors who believed that they were working for an $18 million corporation, when the corporation was actually penniless. That is sufficient to establish a fraud or wrong. *See, e.g., Police & Fire Retirement Sys. of the City of Detroit v. Leibowitz*, 2017 WL 603551 at *4-5 (Mich. Ct. of Appeals 2017) (Holding that even a breach of contract not involving fraud is sufficient to establish a "fraud or wrong" for purposes of piercing a corporate veil: "Evidence that defendant manipulated Invescor in such a manner that Invescor was left without sufficient assets to meet its obligations to plaintiff would support a conclusion that the entity, Invescor, was used to commit a

---

[26] *See, e.g.*, Deposition of Jeffrey Hauswirth, Docket No. [#53-5], dep. pp. 22-23 (Indicating that "no one" told him about the asset sale.); *see also, id.* at p. 22 (When asked, essentially, what he would have done if he been told about the true state of affairs that was causing his invoices to go unpaid, Hauswirth testified, "That – that would have – that would have resulted in a – a chain of events that never took place.").

wrong."); *see also, Woodridge v. Hills Ass'n v. Williams*, 2013 WL 5762990 at *3 (Mich. Ct. of Appeals 2013) (A "fraud or wrong" was established where defendant misused corporation "to circumvent plaintiff's collection efforts."); *Green v. Ziegelman*, 873 N.W.2d at 810 ("The evidence supported a finding that Ziegelman exercised his control over Ziegelman Architects in a manner that wronged Green, Hendrickson, Esper, and Libwag. He misled them into believing that Ziegelman Architects was a viable business when he knew that Ziegelman Architects had no independent source of income with which to pay contingent liabilities.").

Third, and finally, unless the corporate veil is pierced, Baird's misuse of Old King Par's corporate form will result in unjust injury to creditors, including Izzo. In that regard, considering the totality of the equities, it would be unjust for the Court to find that Old King Par has some separate existence apart from Mr. Baird, since that would allow the mistreatment of Izzo, discussed above, to go unremedied. *See*, *Green v. Ziegelman*, 873 N.W.2d at 807–808, 810-811 ("[T]he trial court must determine whether the wrong would cause the complainant to suffer an unjust loss. . . . *[A] loss is not unjust if the complainant had full knowledge of the circumstances surrounding the owner's use of the entity and agreed to proceed despite that knowledge.* [But,] [i]f, considering the totality of the equities, the trial court would be consummating a wrong by honoring an entity's separate existence, the court may disregard the entity's separate existence. . . . From the evidence of Ziegelman's operation of Ziegelman Architects, the trial court could reasonably conclude that Ziegelman himself regarded Ziegelman Architects as a sham entity that existed only to suit his personal needs and could be discarded with impunity. A reasonable trial court examining these equities could conclude that it would be unjust to allow the loss to stand because, by failing to disregard Ziegelman Architects' separate existence from Ziegelman,

the trial court would consummate the wrong that Ziegelman perpetrated through his control of Ziegelman Architects.") (emphasis added).

For all of the foregoing reasons, the Court finds that Izzo is entitled to partial summary judgment, that defendant William Baird is Old King Par's alter ego, for purposes of the companion patent infringement action. As requested by Izzo, the Court finds that Baird "is liable for the full amount of damages [including interest, enhanced damages and attorney fees, as may be determined by the Court,] for [Old King Par's/B&P Baird Holdings, Inc's] infringement of U.S. Patent No. 5,042,704 belonging to Plaintiff Izzo Golf Inc., as adjudged in the action styled *Izzo Golf Inc. v. King Par Golf Inc.*, No. 6:02-CV-6012 (W.D.N.Y.)." Although Baird has contended that his liability should be limited to the amount of asset-sale proceeds that he took from Old King Par, he has provided no legal authority for that claim. Moreover, as noted earlier, Michigan law indicates that once the corporate veil is pierced, the alter-ego shareholder stands in the shoes of the corporation.

CONCLUSION

Izzo's motion for partial summary judgment [#53] is granted.

SO ORDERED.

Dated:      Rochester, New York
           June 6, 2018

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge